*E-FILED - 9/28/10*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIEU PHONG NGO, | ) No. C 08-0620 RMW (PR) |
| Petitioner, | ) ORDER GRANTING WRIT OF |
| v. | ) HABEAS CORPUS |
| BEN CURRY, Warden, | ) |
| Respondent. | ) |

Petitioner, a state prisoner proceeding pro se, sought a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging a 2006 decision by the California Board of Parole Hearings ("Board") finding him unsuitable for parole. Respondent was ordered to show cause why the writ should not be granted. Respondent has filed an answer, along with a supporting memorandum of points and authorities and exhibits. Petitioner has responded with a traverse. For the reasons set forth below, the petition for a writ of habeas corpus is **GRANTED**.

## BACKGROUND[1]

On September 18, 1992, the victim, a member of the Fullerton Tokers Town gang, and a member of the Fullerton Boyz gang, confronted each other claiming their respective gang

---

[1] The relevant facts are taken from the Transcript of the February 9, 2006 Subsequent Parole Consideration Hearing. (Resp. Ex. 1, Ex. A ("Tr.").)

Order Granting Writ of Habeas Corpus
P:\PRO-SE\SJ.Rmw\HC.08\Ngo620hc.wpd

1  affiliations. (Tr. at 6.) Later in the day, the Fullerton Boyz, including petitioner, waited for the
2  15-year old victim at Fullerton High School. (Id.) As the victim was walking home, petitioner
3  and his friends attacked and beat him. (Id.) As they were beating him, Usumang Muhamed, part
4  of petitioner's group, shot and killed the victim. (Id.) Petitioner and the rest of the group fled
5  the area. (Id.) Petitioner, Jimmy Dao, and Asat Cham were subsequently found and
6  apprehended in Washington and the murder weapon, a stolen .22 caliber handgun, was recovered
7  from their vehicle. (Id.)

On October 21, 1993, after petitioner pleaded guilty to and was convicted of second degree murder with the use of a firearm, he was sentenced to 16-years to life. (Petition at 2.) Petitioner filed a state habeas petition in superior court challenging the denial of his parole. The superior court denied petitioner's petition on August 31, 2006. The California Court of Appeal also denied his petition on November 9, 2006. The California Supreme Court denied his petition on May 23, 2007. Petitioner thereafter filed the instant petition.

## DISCUSSION

A.  Standard of Review

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, Williams (Terry) v. Taylor, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case

1  differently than [the Supreme] Court has on a set of materially indistinguishable facts."
2  Williams (Terry), 529 U.S. at 412-13.  A state court decision is an "unreasonable application of"
3  Supreme Court authority, that is, falls under the second clause of § 2254(d)(1), if it correctly
4  identifies the governing legal principle from the Supreme Court's decisions but "unreasonably
5  applies that principle to the facts of the prisoner's case." Id. at 413.  The federal court on habeas
6  review may not issue the writ "simply because that court concludes in its independent judgment
7  that the relevant state-court decision applied clearly established federal law erroneously or
8  incorrectly." Id. at 411.  Rather, the application must be "objectively unreasonable" to support
9  granting the writ. See id. at 409.

10  "Factual determinations by state courts are presumed correct absent clear and convincing
11  evidence to the contrary." Miller-El, 537 U.S. at 340.  Under 28 U.S.C. § 2254(d)(2), a state
12  court decision "based on a factual determination will not be overturned on factual grounds unless
13  objectively unreasonable in light of the evidence presented in the state-court proceeding."
14  Miller-El, 537 U.S. at 340; see also Torres v. Prunty, 223 F.3d 1103, 1107 (9th Cir. 2000).

15  When there is no reasoned opinion from the highest state court to consider the
16  petitioner's claims, the court looks to the last reasoned opinion. See Ylst v. Nunnemaker, 501
17  U.S. 797, 801-06 (1991); Shackleford v. Hubbard, 234 F.3d 1072, 1079, n.2 (9th Cir. 2000).  In
18  this case, the last reasoned opinion is that of the superior court denying petitioner's habeas
19  petition (Resp. Ex. 2).

20  A.    February 8, 2006 Board Hearing

21  Petitioner had been incarcerated for approximately twelve years at the time of his 2006
22  parole suitability hearing.  Petitioner's minimum parole eligibility date was May 24, 2003 and
23  the 2006 hearing was his third parole eligibility hearing.  When questioned about the crime,
24  petitioner stated that at the time, he was trying to sort out his life and was attending college.  (Tr.
25  at 43.)  He had not seen his co-defendants for over a year before the crime and was in town to
26  visit them.  (Id.)  Petitioner stated that they drove to Fullerton High School to wait for the victim.
27  (Id. at 41.)  Petitioner believed that they were confronting the victim to engage in a fist fight but
28  he never intended to take the victim's life.  (Id. at 44.)  Petitioner knew that one of his friends

1  brought a gun, but explained that they only had it for protection in case someone else was armed.
2  (2002 Prisoner Evaluation at 1.) After the shooting, petitioner's friends burned the car to get rid
3  of it. (Tr. at 41-42.) Petitioner is not sure where the murder weapon came from, but believed
4  Asat Cham had stolen it. (Id. at 42.)

5        In terms of petitioner's criminal history, the Board noted that he had minimal contact
6  with law enforcement. (Id. at 6-7.) Petitioner had no juvenile record. (Id. at 6.) As an adult, he
7  was arrested on March 30, 1992 for possession of a controlled substance (three pieces of rock
8  cocaine). (Id. at 7.) Petitioner explained that a friend introduced him to cocaine, so he decided
9  to try it and bought three pieces. (Id. at 46.) On the way home, petitioner was pulled over and
10 arrested for possession. (Id. at 46-47.) Petitioner was sent to a diversion program pursuant to
11 California Penal Code § 1000. (Id. at 7.) Then, on September 22, 1992, petitioner was arrested
12 for possession of stolen property, which was subsequently dismissed. (Id.)

13       Petitioner came to the United States from Vietnam when he was six years old. (Id. at 7.)
14 Petitioner graduated from high school in 1991 and was attending college at the time of the crime.
15 (Id. at 7-8.) Petitioner had been working at his family's liquor store and lived with his parents.
16 (Id. at 8, 10.) He has five siblings, none of whom have had any trouble with the law. (Id. at 10-
17 11.)

18       While institutionalized, petitioner has been enrolled in independent studies through Coast
19 Line Community College. (Id. at 13-14.) At the time of his hearing, petitioner had completed 41
20 units out of the 60 needed in order to achieve his AA degree. (Id. at 14-18.) Petitioner received
21 certificates of completion in automotive refinishing and upholstery, was on the waiting list for
22 data processing, and upgraded as a forklift operator. (Id. at 19.) Petitioner was currently
23 working as a culinary store keeper office aide. (Id.) Petitioner completed an anger management
24 course, several peer educational classes, salesmanship, and "Key to Fatherhood." (Id. at 20.)
25 Throughout his incarceration, petitioner received two minor disciplinary reports, one for failure
26 to respond to a medical duckett and one for having a covered window, and no major or minor
27 disciplinary reports since 2000. (Id. at 22.) The Board noted that since petitioner's last parole
28 hearing in 2004, he had earned at least eight laudatory chronos and received several positive

1  written comments from his supervisors. (Id. at 22-23.)

2  Petitioner's most recent psychological report, dated January 31, 2002, concluded that he
3  did not suffer from any psychiatric illness. (Id. at 22.) The doctor reported that petitioner agreed
4  with the official version of the crime, and found that cocaine use and gang affiliation were
5  factors that resulted in the offense. (Id.) The doctor also noted that petitioner did not have a
6  mental disorder, and appeared to be competent and take responsibility for his behavior. (Id.)

7  As a parole plan, petitioner provided an organized plan, articulating what he planned to
8  do in his first year on parole, and then for the following two to five years. (Id. at 25, 29-31.)
9  Petitioner's plans included continuing to work toward his AA degree, reinforcing his relationship
10 with his family, continuing to participate in NA, and living with his mother in Monterey Park.
11 (Id. at 25-26.) Petitioner also lined up alternatives as a back up plan. (Id. at 26-27.) Petitioner
12 had potential employment as well as many letters of support, including one from his former trial
13 counsel. (Id. at 27-28, 32-38.)

14 Petitioner stated that at the time of the crime, he felt like he wanted to be in a gang. (Id.
15 at 8-9.) He was a child who wanted to be a part of something but never realized what the
16 potential consequences of joining a gang were. (Id. at 9.) Since being incarcerated, petitioner
17 learned that he chose the wrong friends which ruined his life. (Id.) He has stayed away from
18 gang life, despite the fact that some of his co-defendants were housed within the same
19 institution, and has not been involved in any violence while in prison. (Id. at 45, 52.) Petitioner
20 expressed remorse for what he did to the victim and, as a result, to the victim's family, and stated
21 that he took full responsibility for his actions. (Id. at 44-45.)

22 The Board denied parole. It found that the crime was carried out in an especially cruel
23 and callous manner by beating a 15-year old victim, and it was dispassionate and calculated
24 because they were lying in wait for the victim. (Id. at 60-61.) The Board observed that the
25 crime risked public safety because it occurred near a high school and the motive for the crime
26 was extremely trivial in relation to the offense. (Id. at 64.) The Board further stated, "[The
27 crime] was gang activity and you told the panel 'I thought it was going to be a fist fight,' that
28 minimizes the gravity of the crime, your involvement in it and therefore your insight into the

1 gravity of this crime." (Id. at 64.)

2 The Board also commended petitioner for having a "relatively criminal free background,"
3 a "history of stable relationships," no "long history with established gangs," and a history of
4 "strong stable social support." (Id. at 61.) The Board also commended petitioner's institutional
5 behavior, long list of achievements, and consistent participation in self-help and therapy. (Id. at
6 61-62.) The Board recognized that petitioner suffered only two minor misconduct reports and
7 that the psychological report was generally supportive of release. (Id. at 62.)

8 B.    State Court Decisions

9 Petitioner filed a state habeas petition in superior court. In denying the petition, the state
10 court concluded that there was "some evidence" to support the Board's denial. (Resp. Ex. 2.)
11 The court relied on In re Dannenberg, 34 Cal. 4th 1061 (2005) and concluded that the Board did
12 not abuse its discretion in denying parole. (Id.) The court determined that because the Board
13 pointed to other factors beyond the minimum elements of the commitment offense, i.e., that the
14 crime was gang-related and petitioner minimized his role in the crime, the Board "was not
15 required to consider" the remaining factors. (Id. at 3.) The court therefore denied habeas relief.
16 (Id. at 2-3.) The California Court of Appeal and California Supreme Court both denied
17 petitioner's subsequent state habeas petitions.

18 C.    Analysis

19 The Due Process Clause does not, by itself, entitle a prisoner to release on parole in the
20 absence of some evidence of his or her "current dangerousness." Hayward v. Marshall, 603 F.3d
21 546, 555, 561 (9th Cir. 2010) (en banc). Under California law, however, "some evidence" of
22 current dangerousness is required in order to deny parole. Id. at 562 (citing In re Lawrence, 44
23 Cal. 4th 1181, 1205-06 (2008) and In re Shaputis, 44 Cal. 4th 1241 (2008)). This requirement
24 gives California prisoners a liberty interest, protected by the federal constitutional guarantee of
25 due process, in release on parole in the absence of "some evidence" of current dangerousness.
26 Cooke v. Solis, 606 F.3d 1206, 1213-1214 (9th Cir. 2010).

27 When a federal habeas court in this circuit is faced with a claim by a California prisoner
28 that his right to due process was violated because the denial of parole was not supported by

"some evidence," the court analyzes whether the state court decision reflects "an 'unreasonable application'[] of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'"  Hayward, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(1)-(2)); see Cooke, 606 F.3d at 1213.  California's "some evidence" requirement was summarized in Hayward as follows:

> As a matter of California law, "the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety."  There must be "some evidence" of such a threat, and an aggravated offense "does not, in every case, provide evidence that the inmate is a current threat to public safety."  The prisoner's aggravated offense does not establish current dangerousness "unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state" supports the inference of dangerousness.  Thus, in California, the offense of conviction may be considered, but the consideration must address the determining factor, "a current threat to public safety."

Hawyard, 603 F.3d at 562 (quoting Lawrence, 44 Cal. 4th. at 1191, 1210-14); see Cooke, 606 F.3d at 1213-1214 (describing California's "some evidence" requirement).

Here, a primary, though not exclusive, basis for the Board's determination of parole unsuitability was the nature of the commitment offense.  Lawrence pointed out that few murders would not be characterized as involving some act beyond the minimum elements required for the conviction and thus, "a strict minimum elements inquiry [by a reviewing court] would mandate upholding in every case the denial of parole, regardless of whether other evidence in the record clearly attenuates the predictive value of the offense, and without any consideration of whether the gravity of the offense continues to provide some evidence that the inmate remains a threat to public safety."  Lawrence, 44 Cal 4th at 1218.

Neither the Board nor the Superior Court explained what about the commitment offense showed that petitioner continued to pose a danger.  See id. at 1221 ("the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense").  Neither provided any nexus demonstrating that the circumstances of the murder are "probative of the central issue" of whether petitioner currently poses an unreasonable danger to the public.  Id.  At the time of petitioner's parole hearing, he had been

1  incarcerated for approximately twelve years; petitioner's criminal history revealed that the
2  commitment offense was an isolated incident; petitioner's psychological report was favorable
3  and indicated no mental issues; petitioner's institutional behavior was exemplary; and petitioner
4  earned many academic and rehabilitative achievements while incarcerated.  Moreover, the record
5  demonstrates that, since being incarcerated, petitioner had not been involved with gang-related
6  activities, associated with gang member, or engaged in any violence.  Because the record as a
7  whole attenuates the predictive value that the offense has on whether petitioner currently poses a
8  danger to society, the circumstances of petitioner's commitment offense do not amount to "some
9  evidence," especially in the absence of any articulation of a rational nexus.  See id. at 1218.

10        The question then is whether any other factors for parole unsuitability indicate that the
11  cruel or callous nature of petitioner's commitment offense is still "probative" of the risk he poses
12  to public safety.  Cooke, 606 F.3d at 1214.  The only other factor that the Board and the court
13  relied on was petitioner's lack of insight into the crime.  Specifically, one commissioner
14  explained that while petitioner may be motivated to minimize his role, he believed that petitioner
15  had not yet developed insight to discover the "causative factors" of the crime.  (Tr. at 65.)  The
16  commissioner stated that he disbelieved petitioner's statement that no one intended to kill the
17  victim when petitioner and his friends knew that someone brought a gun to the fight.  (Id.)
18  "[I]t's hard for me to get a gauge on what risk you would pose to public safety when I can't feel
19  comfortable about the level of insight that you've displayed.  And that's what prevents me from
20  granting you a date."  (Id. at 65-66.)

21        A prisoner's remorse or demonstrated understanding of the nature and magnitude of the
22  commitment offense is one factor tending to indicate the prisoner is suitable for release.  15 Cal.
23  Code Regs., tit. 15, § 2402(d)(3).  "Lack of insight," however, is probative of unsuitability only
24  to the extent that it is both (1) demonstrably shown by the record and (2) rationally indicative of
25  the inmate's current dangerousness.  In re Calderon, 184 Cal. App. 4th 670, 690 (2010)
26  (recognizing that "lack of insight" is not a cited factor for unsuitability in the California Code of
27  Regulations).

28        This record contrasts with that in Shaputis, where the California Supreme Court upheld a

Order Granting Writ of Habeas Corpus
P:\PRO-SE\SJ.Rmw\HC.08\Ngo620hc.wpd      8

parole denial based in part on Shaputis' failure to grasp the nature of his commitment offense. Although Shaputis stated that his conduct was "wrong" and that he felt "some remorse" for his crime, he still claimed that his wife's brutal murder was an "accident" and sought to minimize his responsibility. In addition, recent psychological reports indicated that Shaputis' character remained unchanged and that he was "unable to gain insight into his antisocial behavior despite years of therapy and rehabilitative programming." Shaputis, 44 Cal. 4th at 1260 (internal quotation marks omitted).

To be sure, there are cases like Shaputis in which a petitioner's denial of facts do not clearly show a lack of insight and current dangerousness. This case, however, is more like In re Palermo, 171 Cal. App. 4th 1096, 1110-12 (2009). In that case, Palermo was convicted of second degree murder for shooting his girlfriend. At his parole hearing, he insisted that the killing was unintentional as he believed that the gun was not loaded and he was merely playing around when he pointed the gun at her. Id. at 1110. The Board rejected petitioner's explanation and concluded that he lacked insight into his behavior leading up to the killing. The court rejected the Board's reliance on Palermo's "lack of insight" as "some evidence," explaining:

> [I]n contrast to the situations in Shaputis and McClendon[2], defendant's version of the shooting of the victim was not physically impossible and did not strain credulity such that his denial of an intentional killing was delusional, dishonest, or irrational. And, unlike the defendants in Van Houten[3], Shaputis, and McClendon, defendant accepted "full responsibility" for his crime and expressed complete remorse; he participated effectively in rehabilitative programs while in prison; and the psychologists who evaluated him opined that he did not represent a risk of danger to the public if released on parole. Under these circumstances, his continuing insistence that the killing was the

---

[2] In In re McClendon, 113 Cal. App. 4th 315, 319-322 (2003), the California Court of Appeal concluded that the appellant failed to accept complete responsibility for killing his estranged wife by claiming that the killing was unplanned and unintentional and showing no remorse for attacking and killing her companion. The underlying facts demonstrated that at the time of crime, appellant wore rubber gloves, carried a loaded handgun, a bottle of acid, and a wrench. Appellant entered the house, aimed the gun at his wife as she sat next to another man and shot her in the head. Appellant tried to shoot the man, the gun jammed, and appellant used his wrench to hit the man two or three times in the head.

[3] In In re Van Houten, 116 Cal. App. 4th 339 (2004), the California Court of Appeal concluded that the appellant minimized her culpability and "deflected her responsibility for her actions on [Charles] Manson," of whom she was a disciple. Id. at 344, 355.

Order Granting Writ of Habeas Corpus
P:\PRO-SE\SJ.Rmw\HC.08\Ngo620hc.wpd                9

> unintentional result of his foolish conduct (a claim which is not necessarily inconsistent with the evidence) does not support the Board's finding that he remains a danger to public safety.

Id. at 1112.

Similarly here, petitioner's version of events does not strain credulity, is not physically impossible, is not irrational nor delusional.  During the hearing, petitioner explained that the "causative factors" of the crime were a result of being a 19-year old immature and naive young man who was trying to fit in with a group of others.  Petitioner repeatedly apologized for his role in the victim's death, though he also insisted that it was never his intention to kill the victim, he believed that there was only going to be a fist-fight, and he did not personally take the victim's life.  Petitioner has accepted responsibility for the murder in that he recognizes his involvement resulted in the death of the victim; he expressed complete remorse; the psychological reports indicated that Petitioner is remorseful, showed "significant insight into his commitment offense," and recognized the negative aspects of gang involvement.  Cf. Palermo, 171 Cal. App. 4th at 1112.  Here, there was no reliable evidence showing that Petitioner failed to appreciate the significance of his offense or lacked remorse or insight into his role in the offense.  That petitioner does not fully accept every aspect of the Board's version of the events is not "some evidence" of current dangerousness.  Cf. Lawrence, 44 Cal. 4th at 1213-1214 ("Because the parole decision represents a prospective view – essentially a prediction concerning the future -- and reflects an uncertain conclusion, rarely (if ever) will the existence of a single isolated fact in the record, evaluated in a vacuum, suffice to support or refute that decision.").

Therefore, pursuant to the standard announced in Hayward entitling a petitioner to habeas relief if the state court unreasonably applied California's "some evidence" requirement, the petition for a writ of habeas corpus in this case is granted.  See Hayward, 603 F.3d at 563 (citing 28 U.S.C. § 2254(d)(1)); see also Cooke, 606 F.3d at 1216.

## CONCLUSION

The petition for a writ of habeas corpus is GRANTED.  Within thirty (30) days of the date of this order, the California Board of Parole Hearings must set a parole date for petitioner in accordance with Section 3041(a) of the California Penal Code.  See Pirtle, 611 F.3d at 1025.

1 Within ten (10) days thereafter, respondent must file a notice with the Court indicating whether
2 petitioner was released on parole.
3     The Clerk of the Court shall terminate all pending motions, enter judgment and close the
4 file.
5     IT IS SO ORDERED.
6 DATED: 9/28/10

*Ronald M. Whyte*
RONALD M. WHYTE
United States District Judge